RESSLER LEATHER COMPANY v. W. H. AILOR, et al.

Eastern Section. September 24, 1927.

Petition for Certiorari denied by Supreme Court, March 10, 1928.

John Jennings, Jr., and J. Bailey Wray, of Knoxville, for plaintiff in error.

Frank Montgomery, of Knoxville, for City.

Thurman Ailor and J. R. Ailor, of Knoxville, for Ailor & Hickey.

Webb, Baker & Egerton, of Knoxville, for L. D. Tyson, et al.

THOMPSON, J. Mrs. Bettie H. Tyson, wife of L. D. Tyson, was the sole owner of a lot and building at the northeast corner of North Gay street and Magnolia avenue, Knoxville, Tennessee. The build-

ing extended along the east side of North Gay street for a distance of 140 feet north from Magnolia avenue, and along the north side of Magnolia avenue for a distance of sixty feet east from North Gay street. It was divided into a number of storerooms fronting on North Gay street, i. e., Nos. 400-402-404-408-410-412, and under each of these storerooms there was a basement. There were partition walls between these basements but they had an opening in them eight feet wide which would permit the passage of water (provided it were deep enough) from one basement to another.

Along the rear (east side) of the building and on the lot of Mrs. Tyson there was a six-foot strip of land covered by concrete or cement. This strip extended the entire width of the building and terminated on the south at the sidewalk on the north side of Magnolia avenue. Underneath this concrete or cement strip there was a sewer or drain pipe which emptied into the sewer underneath Magnolia avenue. There were three or four down-spouts on the rear or east wall of the building and these down-spouts extended down into the sewer or drain pipe underneath the concrete or cement strip. They carried the water which fell on top of the building into the sewer or drain pipe under the concrete or cement strip, and that sewer or drain pipe carried it into the sewer under Magnolia avenue.

The floors of basements Nos. 400 and 402 were upon the same level, but a concrete fill between two and three inches high separated them. They were both a little lower than the floors of Nos. 404 and 408, which seem to have been upon the same level. The floors of all the basements were between eight and nine feet lower than the surface of the concrete or cement strip. The rear or east wall of the building was made of brick and, not being water proof, water could come through it into the basements. It seems that water seeping through this wall had caused dampness and a small amount of trouble and that to take care of this a small ditch or drain had been dug or constructed in the floor of the basements and running along this east wall.

The furnace which heated the building was in basement No. 408, and the coal used in the furnace was stored there.

The plaintiff, Ressler Leather Company, was a Tennessee corporation which operated a wholesale and retail shoe accessories store and carried on hand and in stock large quantities of shoe heels, and other shoe accessories.

On September 12, 1922, the plaintiff leased a part of the building, portions of the lease being as follows:

"This indenture, made this 12th day of September, 1922 between J. B. & W. G. Brownlow, agents for Mrs. L. D. Tyson of Knox county, Tennessee, of the first part and The Ressler Leather Company, a Tennessee corporation of the second part,

"Witnesseth, That the said parties of the first part, for and in consideration of the rents, covenants and agreements of the said party of the second part hereinafter contained, hath let, demised and leased and doth hereby let, demise and lease unto said parties of the second part those certain premises described as follows: That certain store room # 408 North Gay street, together with that portion of the basement under 404 now occupied by second party, to be used for the purpose of a shoe accessories store and no other.

"To Have And To Hold the said demised premises to the said party of the second part, his executors, heirs and administrators for and during the term of three years from and after twelve o'clock at noon of the 1st day of October, 1922, yielding and paying therefor to the said parties of the first part, their heirs and assigns:

"Six hundred and sixty dollars per annum the first year;

"Seven hundred and twenty dollars per annum the second year;

"Seven hundred and ninety dollars per annum the third year to be paid in equal monthly installments on the first day of each month in advance, during the term of this lease.

"Provided always, and these presents are upon the following express conditions:

"1. If the rent hereby reserved or any part thereof shall be and remain unpaid and in arrear for the space of ten days after any of the times when the same becomes due and payable as above provided, then at the option of the parties of the first part, their heirs or assigns, this lease shall be forfeited and become void.

. . . . . . .

"3. Party of the second part shall make good any injury or breakage done by him or his agents, employees or visitors, or any damage caused by the overflow of water, steam or gas resulting from the negligence of him or his agents, employees or visitors; he shall immediately replace any glass that may be broken or cracked, unless caused by fire, and shall pay for the unstopping of any sink, water closet, lavatory or bath tub unless the stoppage be reported to parties of the first part within ten days of the date first above written.

"4. If at any time the said leased premises shall be destroyed or rendered uninhabitable by fire, flood or storm, then at the option of either parties of the first or second part, this lease shall become null and void, or if any part of the building of which said premises is a component part, shall be destroyed or substantially destroyed, then at the option of parties of the first part, this lease shall become null and void.

"5. Parties of the first part shall repair as promptly as possible any defects in the roof, gas pipes or water pipes, not caused by the negligence of the party of the second part, his employees or visitors, but in no event shall the parties of the first part be liable for any

damage to property or person from any water, gas or electricity which may leak into or flow from any part of said premises, or from the pipes or plumbing works of the same.

. . . . . . .

"13. It is agreed by all parties that the rents herein mentioned shall be paid through J. B. & W. G. Brownlow or their assigns who shall retain a five per cent commission, as their agency fee on all rentals accruing under this lease; provided, however, that no assignment shall be made of this agency except to a reputable and competent real estate agency; and provided further that the owner of the within described premises may at any time terminate this agency contract by a cash payment to the agent of an amount, which if placed at ten per cent simple interest would be sufficient to meet the future commission payments as they fall due.

"In Witness Whereof, the said parties of the first and second parts have hereunto set their hands and seals the day and year first above written.

|  |  |  |
|---|---|---|
| | "J. B. & W. G. Brownlow | (Seal) |
| "Approved.: | By J. B. Brownlow | |
| "L. D. Tyson | The Ressler Leather Company | (Seal) |
| | "By J. J. Ressler | (Seal) |
| | "President." | |

It should be stated here that at the time this lease was executed the officers of the plaintiff company knew that the walls of the building were not water proof and that there had been some slight trouble from leaks or seepage—but nothing of the kind hereinafter dealt with.

It seems that shortly after the foregoing lease was executed an oral agreement was reached between the Brownlows and plaintiff that plaintiff should occupy all of basement 404 instead of basement 408, but that plaintiff should pay the previous tenant of 404 the sum of $5 per month. From that time on plaintiff occupied all of said basement 404, and paid the previous tenant said sum of $5 per month. Still later an oral agreement was reached between the Brownlows and plaintiff whereby plaintiff also acquired and used basement 402 upon the payment of $5 per month to the previous tenant. Under this last agreement plaintiff was given the right to cut a doorway between basements 404 and 402, which it did. From that time on plaintiff used both basements 402 and 404 (but not 408) and had some $28,000 worth of its goods stored therein.

It is undisputed that as between the Brownlows and Mrs. Tyson the former had the right to rent the building and had authority and it was their duty to make minor repairs.

Such was the situation in April, 1924. In April, 1924, Mrs. Johanna Hickey who owned the lot immediately east of the Tyson property contracted with W. H. Ailor, a building contractor, to

construct a two story brick building on it. This building was to front on Magnolia avenue and was to be leased to an undertaking company. Ailor began the performance of this contract and the first thing he did was to excavate for the basement. He dug this excavation some ten or twelve feet deep and up to the east edge of the above-mentioned concrete or cement strip—his purpose of course being to construct the west side or wall of her building at the east edge of said strip, thus leaving a space of only six feet between the two buildings. This excavation quite naturally caused some of the earth underneath the strip to cave in.

When the tenants in the basements of the Tyson building saw that Mrs. Hickey's building was going to be constructed only six feet from the Tyson building they protested to Brownlow that their light and air would be obstructed and cut off. Brownlow then told Mrs. Hickey that if she constructed her building as contemplated he would build a high fence on the east edge of the strip and white-wash it so that it would throw light into the basements of the Tyson building, and Mrs. Hickey of course realized that this fence would damage the west side of her building in which she expected to have windows. It resulted that an agreement or contract was reached between the Brownlows and Mrs. Hickey that she would construct the west wall of her building three feet east of the east edge of the six-foot strip so as to leave a space of nine feet between the two buildings; that the surface of this nine-foot strip would be covered with heavy concrete or cement so that it could be used as an alley, and that Mrs. Hickey and Mrs. Tyson would each pay one-half of the cost of the concrete surfacing which was to be done by Mrs. Hickey's contractor, Mr. Ailor.

So Mr. Ailor constructed the west wall of Mrs. Hickey's building three feet east of the east edge of the six-foot concrete strip, and having excavated up to said strip, a "ditch" three feet wide and ten or twelve feet deep was left immediately east of the east edge of the said six-foot strip. This "ditch" stayed open for a considerable length of time, and when Ailor did begin filling it up he did so by backing heavy trucks into and along the strip from Magnolia avenue. These trucks crushed the concrete or cement covering of the said six-foot strip and also crushed the sewer or drain pipe underneath it. They (or something) also disconnected or damaged one of the above-mentioned down-spouts so as to cause it to empty the water onto the six-foot strip instead of into the sewer or drain pipe underneath it. It seems also that the materials which Ailor used to fill the "ditch" consisted of bricks, broken pieces of asphalt, etc., through which water would readily flow.

Realizing the danger to the goods stored in basements 402 and 404, Mr. Ressler of the plaintiff company called Mr. J. B. Brownlow's attention to it and Mr. Brownlow promised to remedy the

situation. This was some days prior to June 15, 1924. But nothing was done to remedy the situation, and on June 15, 1924, there was a rain and water ran into the basements 402 and 404 and did damage to the goods of plaintiff to the extent of about $300. Mr. Ressler again called Mr. Brownlow's attention to the situation and Mr. Brownlow again on several occasions promised to attend to the matter. But nothing was done, and on June 25, 1924, it rained rather hard and a great deal of water ran through the east wall of the Tyson building into the basements thereof and damaged the goods of the plaintiff—which damage (together with the $300 damages sustained on June 15th) the jury has assessed at $4500.

To recover these damages the plaintiff brought this suit against the City of Knoxville, Mrs. L. D. Tyson, Mr. L. D. Tyson, J. B. Brownlow, W. G. Brownlow, Mrs. Johanna Hickey and W. H. Ailor. At the trial a nonsuit was entered as to the city, and on motion therefore verdicts were directed in favor of Mr. L. D. Tyson and Mrs. Johanna Hickey. The question of the liability of the defendants, Mrs. L. D. Tyson, J. B. Brownlow, W. G. Brownlow and W. H. Ailor, was submitted to the jury which rendered verdict against all four of said defendants for the sum of $4500. Mrs. Tyson and the two Brownlows filed motion for new trial and upon consideration of the same the trial judge suggested a remittitur of $2000, which the plaintiff made under protest. Judgment for $2500, was then rendered against Mrs. Tyson and the two Brownlows and they have appealed to this court and have assigned error. The plaintiff also has appealed and has assigned as error the action of the trial court in suggesting the remittitur, and also the action of the trial court in directing a verdict in favor of Mrs. Johanna Hickey. However, plaintiff filed no motion for a new trial in the court below.

We will first consider the questions raised by the assignments of error filed in behalf of Mrs. Tyson and the two Brownlows.

They insist that there can be no liability against them as lessors on account of Condition No. 5 of the lease which is as follows:

"5. Parties of the first part shall repair as promptly as possibly any defects in the roof, gas pipes or water pipes, not caused by the negligence of the party of the second part, his employees or visitors, but in no event shall the parties of the first part be liable for any damage to property or person from any water, gas or electricity which may leak into or flow from any part of said premises, or from the pipes or plumbing works of the same."

Their insistence is of course based upon the latter part of the condition, and in support thereof they cite Railway Co. v. Saulsbury, 115 Tenn., 402, 90 S. W., 624, and Railway Co. v. Lumber Co., 130 Tenn., 354, 170 S. W., 591. Those cases hold that where a railroad company's conduct as a common carrier is not involved it may con-

tract against liability on account of its own negligence and that such a contract is not against public policy.

In the case at bar if the above-quoted condition of the lease could be construed as exempting the lessors from liability on account of the damage sustained by plaintiff we do not think it would be against public policy and therefore void. But in our opinion said condition cannot properly be construed as exempting the lessors from liability under the facts of the case. It is purely a question of construction of the condition or lease to arrive at the intention of the parties, and we do not believe it was their intention to exempt the lessors from liability for damages occasioned and caused in the manner-above indicated. It is true that Ailor's trucks crushed the concrete strip and the sewer or drain pipe underneath—and probably also the down-spout. It is also true that some of the water which got into the basements of the Tyson building probably percolated into them from the "ditch" (which had only been filled with bricks and pieces of concrete, etc., and would still hold water) through the earth under the strip, portions of which earth had slid or caved into the "ditch." But the water came from the roof of the Tyson building, and could neither have gone directly from the crushed strip and drain pipe underneath or from the broken down-spout through the wall and into the basements, nor from the "ditch" through the earth underneath the strip, had it not been for the crushed surface of the strip and drain pipe underneath and the broken down-spout. In other words, the water (which caused the damage) from the roof could neither have gone directly from the strip through the wall, nor into the "ditch," had it not been for the crushed surface of the strip and drain pipe underneath and the broken down-spout, all of which were on the lessors' property and all of which they could and should have repaired. But, as should have been stated, they let it remain in that condition for several weeks although Mr. Brownlow frequently promised plaintiff to repair it. And we do not believe that it was the intention of the parties that the lessors should be relieved of liability under such conditions. We are of the opinion that the intention as expressed in the condition of the lease was to relieve the lessors from liability from the slight kind of leaks which it was known to both lessors and lessee were likely to occur in the Tyson building, the walls of which were not water-proof. It probably would also be held that had the water come from Mrs. Hickey's property without being caused to do so by the above-mentioned defects in the lessors' property the condition of the lease would have exempted the lessors from liability, but such was not the case, the primary cause of the damage being the crushed surface of the strip and drain pipe underneath and the broken down-spout, all of which was the lessors' property and all of which as between the lessors and

lessee it was the lessors' duty to repair regardless of the fact that Ailor damaged it.

Moreover, basement 402 and a part of 404 were acquired by plaintiff merely by parol agreement with the Brownlows and at a time subsequent to the execution of the written lease, and it is doubtful whether the terms of the written lease could be held applicable to them. The trial judge, however, impliedly gave the benefit of the condition to the lessors to the extent of quoting said condition to the jury but telling them that it would not exempt the lessors from the consequences of their own negligence.

It results that in our opinion there was no error committed with respect to condition five of the lease and the assignments in regard thereto will be overruled.

What has been said also disposes of the contention that there was no material evidence to support the verdict, because the dangerous condition was permitted to remain for several weeks after Brownlow had promised plaintiff to remedy it, and Brownlow is shown to have made only a light effort to induce Ailor to remedy it. The jury was certainly justified in finding that the failure to remedy this dangerous condition for that length of time was negligence.

What has been said also disposes of all questions with respect to proximate cause, and the damages being caused by a third party or by the "ditch" on Mrs. Hickey's property over which neither Mrs. Tyson nor the Brownlows had any control, because the evidence shows that the water which did the damage could not have gotten into the "ditch" but for the crushed surface of the strip and drain pipe underneath and the broken down-spouts, and although Ailor's trucks crushed the surface and drain pipe and may have broken the down-spout, it was the lessors' duty as between them and the lessee to repair the dangerous situation.

Two other assignments of error on behalf of defendants raise the question that the trial court erred in refusing to charge special requests offered by them to the effect that they were required to exercise only such skill, prudence and diligence as an ordinary skillful, prudent and diligent man would have exercised under the same or similar circumstances, and that the fact that water entered the basements was not by itself evidence of negligence. We think the general charge covered these points as fully as was necessary and that the trial court did not err in refusing to give the special requests.

The remaining assignments raise the question that the Brownlows, being agents of a known principal, Mrs. Tyson, and being guilty only of negligence or nonfeasance, as distinguished from misfeasance or malfeasance, and an omission to perform a duty owing to Mrs. Tyson rather than to plaintiff, etc., they (the Brownlows) cannot be held liable to plaintiff who must look only to Mrs. Tyson

for damages. In support of this contention they cite Erwin v. Davenport, 9 Heisk., 48, and Drake v. Hagan, 108 Tenn., 265, 67 S. W., 470; to which we add Elmore v. Brooks, 6 Heisk., 48, and Deadrick v. Bank, 16 Pickle, 458, 45 S. W., 786.

This raises a very serious question, but since the lease was executed in the names of J. B. & W. G. Brownlow, although as agents for Mrs. L. D. Tyson, and obligated them to make repairs, and since Mr. J. B. Brownlow expressly promised plaintiff to repair the dangerous condition which caused the damages and upon which promise plaintiff relied, whereas he negligently failed to make good his promise, we think we should overrule the contention. See 21 R. C. L., page 247, section 27 under ''Principal and Agent''—also the latter part of section 30 on pages 851-852.

It seems to us that under the facts and circumstances of this case, after Mr. Brownlow promised to repair and remedy the dangerous situation, his failure to do so when he knew that plaintiff was relying on him amounted to more than a mere failure to perform a duty owing to Mrs. Tyson. It seems to us that his promise under the circumstances should be held to have created a duty owing directly to the plaintiff, and that he cannot be heard to say that he failed to perform a duty owing only to his principal, Mrs. Tyson, and that he was guilty of only a nonfeasance for which he and his firm were not liable to plaintiff. As stated in R. C. L., the trend of modern authority is away from the doctrine of nonliability, and while the question in the cause at bar is not free from doubt, we will overrule the assignments raising the question, and hold the Brownlows liable.

The foregoing disposes of the questions raised on behalf of the defendant.

As stated, the plaintiff has appealed and has assigned as error the action of the trial court in directing a verdict (at the conclusion of all the evidence) in favor of Mrs. Johanna Hickey. But the plaintiff filed no motion for a new trial and we therefore cannot consider the question. Seymour v. Railway Company, 9 Cates, 98, 98 S. W., 174, and Railroad v. Ray, 16 Cates, 16, 134 S. W., 858.

The plaintiff has also assigned error on the action of the trial court in suggesting the remittitur. The plaintiff at the trial introduced a list or inventory of the damaged goods and testified that the salability thereof had been destroyed. The total of this list or inventory was $5,046.50. But the plaintiff also filed in evidence samples of the damaged goods; that is, shoe heels, etc., which were in the basements and had been wet by the water. The trial judge of course saw these samples, but we have not. They were not sent up with the record. The proof also disclosed that at the trial the plaintiff still had in its possession about two-thirds of the damaged goods —which would indicate that they still had some salable value. Also

it seems that in the trial of a former suit against the city involving another overflow of water the plaintiff's president testified that the value of the goods damaged by the overflows involved in the cause at bar amounted to only $2500. In view of these circumstances we do not think that the trial court erred in suggesting the remittitur, and the assignment raising the question will be overruled.

It results that in our opinion there was no error in the judgment of the lower court and the same will be affirmed with costs.

Portrum and Snodgrass, JJ., concur.